UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| EDWIN C. MARTIN, JR., et al, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:05CV1857 AGF |
| | ) | |
| JAMES P. HOLLORAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM AND ORDER**

This diversity case is before the Court[1] on several motions for summary

judgment.  Plaintiffs (a California law firm and an associated individual, hereinafter

referred to collectively as "Plaintiffs") filed this action against three related Defendants

(two Missouri law firms and an associated individual, hereinafter referred to collectively

as "Defendants") in this Court on October 11, 2005, claiming that Defendants owed

Plaintiffs an accounting and money for services rendered in connection with tort cases

involving workers who were exposed to asbestos.  For the reasons set forth below,

summary judgment shall be entered in favor of Defendants on all claims except those

based upon an alleged written agreement between the parties, on the ground of the statute

of limitations.

---

[1]    The parties have consented to the exercise of authority by the undersigned
United States Magistrate Judge under 28 U.S.C. § 636(c).

## BACKGROUND

In their eight-count amended complaint filed on September 28, 2006, Plaintiffs allege that in 1987 they entered into a written "association agreement" with Defendants, under which Plaintiffs were to initiate, organize, and conduct medical screenings of individuals in Missouri who had been exposed to asbestos, and then refer to Defendants all such individuals who had tested positive for an asbestos-related injury. Defendants were to pursue claims for damages on behalf of these individuals, who executed a retainer agreement with Plaintiffs and Defendants as their attorneys for a 30% contingency fee.

Plaintiffs further allege that pursuant to the association agreement, Defendants were to pay Plaintiffs 1/3 of the 30% contingency fee Defendants received from any settlement or judgment pertaining to such cases. Plaintiffs allege that Defendants also agreed to maintain an accounting of all expenses and income relative to the cases in question, and to disburse promptly the attorneys' fees due Plaintiffs pursuant to the agreement. Plaintiffs assert alternatively that the agreement was oral, or constituted an oral partnership agreement. They allege that Defendants did not maintain proper accounts, failed to provide Plaintiffs with accounts upon Plaintiffs' requests, and failed to pay Plaintiffs money due Plaintiffs under the agreement, with the exception of one $100,000 payment.

Plaintiffs seek damages under theories of breach of a written agreement (Count I), breach of oral contract (Count II), breach of partnership agreement (Count IV), breach of fiduciary duty (Count VI), unjust enrichment and quantum meruit (Count VII), and

misrepresentation (Count VIII).  In Counts III and V,  Plaintiffs seek a contractual accounting and a partnership accounting, respectively.  There is a factual dispute as to whether the parties ever entered into a written agreement.  Defendants, however, do not dispute that an oral agreement along the lines of that described in the complaint existed.

Defendants argue that they are entitled to summary judgment for two separate reasons: (1) the agreement is an unenforceable fee-sharing agreement under Missouri law, in that Plaintiffs did no legal work on the cases in question; and (2) this action is barred by the statute of limitations and/or laches.  Plaintiffs have brought their own motion for partial summary judgment, arguing that they are entitled to such judgment on Counts II, IV, V, and VI.

The record establishes the following.  During the 1980's Plaintiffs represented union workers who suffered from asbestos-related illnesses.  In order to reduce the sometimes prohibitive cost for workers to obtain a diagnosis of such an illness, Plaintiffs, in collaboration with a cardio-pulmonary technician and Kaye Kilburn, M.D., designed and constructed a mobile screening unit.  In addition to creating the concept of the mobile unit, Plaintiffs assisted in developing the procedures for its operation.  The unit traveled to various states and screened hundreds of workers at a greatly reduced cost.  The workers were contacted by Plaintiffs through the workers' unions with which Plaintiffs had  previously-established relationships.  The unions selected Plaintiffs to represent their members in the members' asbestos litigation, with the understanding that Plaintiffs would select local counsel in the various states in which the workers lived, and that those local

counsel would file the lawsuits and charge a 30% contingency fee. Plaintiffs visited numerous local unions across the country to arrange for the medical screenings, and helped develop an informational packet about the screening program, which was distributed to the workers. Workers who tested positive for an asbestos-related illness were provided with a copy of their test results, together with a letter from Dr. Kilburn confirming the diagnosis.

Plaintiffs chose Defendants as local counsel for Missouri workers who tested positive, and Plaintiffs and Defendants entered into the association agreement described above, which agreement Defendants may or may not have signed. Medical screenings for asbestos-related illnesses were conducted in St. Louis, Missouri, for over 900 union members, with the mobile screening unit on various days in May and June 1987, October 1989, and March and August 1990. Plaintiffs attended some of the screenings. Plaintiff Edwin Martin testified by deposition that he entered into the same written "Associate Counsel Agreement" with Defendants as he did with local counsel in other states, and that he would not have conducted the St. Louis screenings without such a written agreement signed by Defendant Holloran. (Martin Dep. at 65-67.) Similarly, Martin attested by affidavit (dated February 20, 2006) that Holloran executed a written Associate Counsel Agreement. (Doc. #23 at 4).

Plaintiffs have submitted, as an exhibit, a copy of the form "Associate Counsel Agreement - Asbestos Litigation Project, " which they assert they used with all local counsel, including Defendants, with whom Plaintiffs associated on the project. (Pls.'s

4

Ex. 1 to Doc. #23.)  Martin testified that he has since retired and could not locate a copy of the actual agreement signed by Defendants.  Holloran testified by deposition that he never signed a written agreement.  (Holloran Dep. at 5-6.)  In a letter written by Holloran to Martin on April 16, 2003, however, Holloran refers to the parties' "written agreement." (Pls.' Ex. 34 to Doc. #23.)  When asked about this at his deposition, Holloran testified that the statement was "loose language" on his part.  (Holloran Dep. at 6.)

In any event, it is not disputed that Plaintiffs and Defendants entered into at least an oral agreement setting forth each party's obligations and the agreed-upon division of fees, and that pursuant to this agreement, Plaintiffs referred to Defendants approximately 280 workers who tested positive in the St. Louis screenings.  Defendants then contacted these workers and had them each sign an "Asbestos Retainer Agreement," prepared by Plaintiffs, which provided that the worker was retaining Plaintiffs and Defendants in connection with the recovery of damages for asbestos-caused injuries, and would pay an attorney's fee of 30% of the gross amount of any recovery.  The retainer agreement granted Plaintiffs and Defendants a lien upon the proceeds of any settlement or judgment, for attorney's fees and costs advanced.  (Pls.' Ex. 2 to Doc #23.)

Lawsuits were filed on behalf of these workers between the years 1988 and 1996. Approximately 227 of these lawsuits were filed by Defendants, with the remainder filed by attorneys possibly associated with Defendants.  An interrogatory worksheet prepared by Plaintiffs was contained in 70 of the sampling of 73 case files that were inspected by Plaintiffs during discovery.  Interrogatory responses that referenced Dr.

Kilburn as an expert were contained in 71 of these files. Dr. Kilburn's medical report confirming the asbestos-litigation plaintiff's diagnosis was in 66 of these files.

Martin attests by affidavit that during the pendency of the St. Louis asbestos cases, he was available at all times to assist Defendants with the litigation. He further testified that he provided to all local counsel, "and presumably" to Defendants, copies of sample pleadings, interrogatories, requests for production of documents, and deposition outlines, and that he provided Defendants with computer equipment to assist with document management of the asbestos litigation. Martin attested that during the pendency of the St. Louis asbestos litigation, he met with one of Defendants' associates in Martin's offices in California to discuss "in detail the progress of the cases." Lastly, he attested that during the pendency of these cases, he maintained professional liability insurance "and was jointly responsible for any claims brought against local counsel or myself as a result of legal malpractice." (Doc. #23.)

One lawsuit subject to the parties' agreement resulted in a verdict for the plaintiff/client in the amount of $2.5 million, which was affirmed on appeal on February 2, 1993. Harashe v. Flintkote, 848 S.W.2d 506 (Mo. Ct. App. 1993). An attorney from a South Carolina law firm ("Ness, Motley") acted as co-counsel for the plaintiff in that case. Dr. Kilburn was deposed and videotaped for use at the trial.

By letter to Plaintiffs dated November 29, 1993, Defendants wrote that they were responding to Plaintiffs' letter to them requesting an update on the asbestos case settlements. Defendants wrote that they were enclosing a check in the amount of

$28,000; that a second check in the amount of $32,000 would be paid on or about

January 10, 1994; and that the balance of $115,000 for the asbestos cases settled as of

March 1993, would be paid on January 30, 1994.  Defendants added:

> Our next group of cases are set for trial in March of 1994, and we expect a good deal of movement at that time.  .  .  .  We realistically do not expect any funds from [the settlement with Fireboard] until sometime in the middle of 1994.  .  .  .  We will keep you posted as to the progress in that regard.

A letter to Plaintiffs dated February 10, 1994, stated that Defendants were

enclosing a check in the sum of $115,000.  On February 7, 1997, Defendants wrote as

follows to Plaintiffs:

> We have finally reached a position where we can close out our accounting to you on the asbestos cases referred by you to our offices in 1988 and 1990.

> We participated in the Fireboard Settlement through the Ness, Motley settlement agreement reached independently with Fireboard.  Pursuant to this settlement, we obtained $900,000 in settlement of the case referred to us by you.  We split attorney's fees forty-percent to our office, forty-percent to their office, and twenty-percent to you.  Your share of these fees is in the sum of $60,000.00.

> Lastly, we settled the last fifty cases referred to us by you . . . for a total settlement of . . . $375,000.00.  Your fees of one-third are $41,666.00.

> Attorney's fees owed to you as set out above are $101,666.00 and we are enclosing a check made out to you in that amount.

> We thank you for referring these cases to us, and are glad to say that after nine years, we have finally closed these files.

(Pls.' Ex. 6 to Doc. #23.)

Martin testified by deposition that his recollection was that upon receiving this letter, he did not acquiesce to the new percentage division of fees, whereby Defendants proposed paying Plaintiffs only 20% rather that the 1/3 called for in the parties' agreement; that he brought his objection to Defendants' attention; and that he believed that the parties came to an understanding that the 1/3 provision in their agreement would be honored. (Martin Dep. at 38-41.)

By letter dated January 21, 1999, Defendants wrote as follows to Plaintiffs:

> As you may remember from our initial contacts in approximately 1988, you set up a screening with the boilermakers local in St. Louis, Missouri and set up a subsequent screening in 1990 involving the ironworkers local, the plumbers local and some members of other unions in the area, although not exclusively any particular union. We filed lawsuits in the City of St. Louis concerning all the cases referred to us in both 1988 and 1990, respectively. We have processed all those cases though the court system and have accounted to you for them over the last 8-10 years.
>
> Concerning any ongoing claims extant on those files, we accounted to you for the Johns-Manville portion of the settlements attributed to those files in April, 1997.
>
> The only outstanding matters on those files are bankruptcies with Eagle-Picher and \Celotex [sic]. To date, we have not received payment from Eagle-Picher or Celotex on those files. However, we do expect payment from Eagle-Picher possibly sometime in 1999 and from Celotex hopefully in 1999 or 2000. Based on our review of the bankruptcy plans that have been approved for those companies, we expect a total gross recovery from each bankruptcy on these cases to be approximately $50,000.00 per bankruptcy. They would attract a fee of approximately $12,500.00 each, with the fees set at 25%, and your share of such fees would be one-third as per our agreement. When such monies come to hand, we will send your fee to you directly.

\*　　　\*　　　\*

Hopefully this letter clarifies the matters that remain to be accounted for concerning the asbestos cases you brought to our office in 1988 and 1990. Hopefully we can close these files out as they pertain to you as soon as we get the Eagle-Picher and Celotex bankruptcies resolved.

(Pls.' Ex. 7 to Doc. #23.)

On December 24, 2002, Plaintiffs wrote Defendants, in relevant part:

It has been some time since I heard from your office concerning the status/settlements on the asbestos cases in which we are associated.

\* \* \*

I would appreciate some word from you as to the status of our mutual cases. If all of them have been completely resolved and all associate attorney fees due to my office under our associate agreement have been paid to my office, please confirm that fact. If that is not the case in any regard, please inform me as to those details.

(Pls.' Ex. 25 to Doc. #23.) Plaintiffs sent follow-up letters on January 16, 2003, and February 11, 2003, asking for a response. On February 14, 2003, an attorney who had left Defendants' law firm two years prior, but who was familiar with the asbestos litigation in question, responded by fax, stating:

To the best of my understanding, as [the cases you initiated with Defendants through association with your firm] were filed in 1988 and 1990, they were resolved in the mid to late 1990s and there is nothing I am aware of that remains to be resolved for those cases. As far as I am aware, all fees would have been paid on the 1988 and 1990 cases [in] which you were involved.

(Pls.' Ex. 28 to Doc. #23.) Plaintiffs replied on February 15, 2003, asking for confirmation by someone who had actual personal knowledge of the matter. (Pls.' Ex. 29

to Doc. #23.)  On February 28, 2003, Plaintiffs again asked for such confirmation, and on March 27, 2003, Plaintiffs wrote directly to Defendants asking for this confirmation.

By letter dated April 14, 2003, to Defendants, Plaintiffs memorialized a just-finished phone conversation with Defendants: "We have agreed that I shall prepare a list of mutual asbestos client names . . . and the distribution of such fees, pertaining to those clients.  This verification will either demonstrate that all fees due have been paid per our written agreements, or if not we have agreed that we shall address that issue then."  (Pls.' Ex. 32 to Doc. #23.)  On April 16, 2003, Defendants wrote Plaintiffs:

> I am happy to do what you suggested in your letter of April 14th.  However, please understand that I am certain that any fees that were due you under our written agreement of years past, have been paid.  We did screenings with you in 1988 and 1990, and those claims that were pursued have been settled for seven or eight years and referral fees were paid to you.

(Pls.' Ex. 34 to Doc. #23.)

Correspondence between the parties continued.  By letters dated September 12 and 20, 2003, Plaintiffs continued to request documentation as to the fees collected and disbursed.  In the letter of September 12, Plaintiffs referenced a $2.5 million verdict in a case subject to the agreement.  In response, on September 26, 2003, Defendants wrote:

> As I mentioned to you over the phone and through my letter, I have no files from our asbestos cases as they were all closed years ago, and simply thrown out more than three to four years ago.  I have absolutely no records in my office of these files, just as I have no records of other cases that were closed five to ten years ago.  We have no financial records regarding our business, asbestos or otherwise, prior to 1998 when we went to computers.

* * *

I personally have not handled an asbestos case in more than ten years,
yours or anyone else. I haven't had an asbestos file in my office of any
kind for three or four years.

* * *

With no files or disbursement records that were with those files, I
cannot recreate anything.

(Pls.' Ex. 41 to Doc. #23.)

Also on September 26, 2003, Plaintiffs again asked Defendants for verification.

On October 6, 2003, Defendants explained that the Harashe case had been settled "at a

discount" while the appeal was pending, and that Defendants were certain that a check

had been issued to Plaintiffs for their portion of attorneys' fees. On October 9, 2003,

Plaintiffs wrote that unless Defendants were willing to pursue certain suggested "means

of documentation," Plaintiffs would be forced "to take other action." By letter dated

November 5, 2003, Defendants offered Plaintiffs $50,000 "to put an end to all of this,"

and on December 12, 2003, Defendants sent Plaintiffs a check for $50,000 for full

settlement of the dispute. (Pls.' Ex. 42 to Doc. #23.)

At around that time, Defendants asked two banks for copies of checks from

1993, 1994, and 1997, and were informed by the banks that the banks did not retain

records going that far back in time. On June 17, 2004, Plaintiffs asked Defendants to

open their files "for review by a certified accounting firm of our choice," and noted that

they would hold Defendants' check in trust pending a review of the records. By letter

dated August 16, 2004, Defendants advised that they cancelled payment on the settlement draft. The record indicates that Plaintiffs filed an action against Defendants in state court on December 3, 2004, but then voluntarily dismissed that action. As noted above, Plaintiffs filed the present action on October 11, 2005.

In one motion for summary judgment now before the court, Defendants argue that they are entitled to summary judgment on the basis of the statute of limitations and laches. In another motion for summary judgement they argue that the agreement between the parties was an unenforceable fee-sharing agreement. Plaintiffs oppose these motions, and further argue that they are entitled to summary judgment on the issue of liability on Counts II (breach of oral agreement), IV (breach of partnership agreement), V (partnership accounting), and VI (breach of fiduciary duty).

## DISCUSSION

### Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment, a court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the record. Sokol & Assocs., Inc. v. Techsonic Indus., Inc., 495 F.3d 605, 610 (8th Cir. 2007).

## Statute of Limitations

As the parties recognize, Missouri law governs this diversity case.  The task of a federal court sitting in diversity is to attempt to predict how the forum state's highest court would resolve a question which it has not squarely decided.  <u>Allstate Ins. Co. v. Blount</u>, 491 F.3d 903, 908 (8th Cir. 2007).  The general rule under Missouri law is that actions on contracts must be brought within five years.  Mo. Rev. Stat. § 516.120 states, as applicable here:

> **What actions within five years.**  Within five years:
>
> (1) All actions upon contracts, obligations or liabilities, express or implied, except those mentioned in section 516.110 . . . .

One type of action § 516.110 exempts from those otherwise subject to § 516.120 is "[a]n action upon any writing, whether sealed or unsealed, for the payment of money or property."  § 516.110(1).  Those actions may be commenced within ten years.  <u>Id.</u>  In <u>Hughes Dev. Co. v. Omega Realty Co.</u>, 951 S.W.2d 615, 617 (Mo. 1997) (en banc), the Supreme Court of Missouri overturned nearly a century of case law distinguishing between the five-year and ten-year statute of limitations, and held that the ten-year statute of limitations applied to every breach of contract action in which the plaintiff seeks a judgment from the defendant for payment of money the defendant agreed to pay in a written contract.  <u>Midwest Division-OPRMC, LLC v. Dep't of Soc. Servs.</u>, 241 S.W.3d 371, 384 (Mo. Ct. App. 2007).  The Court no longer limited the ten-year statute to financial instruments.  <u>Id.</u>

Under Missouri law, an action for breach of an oral contract or breach of a fiduciary duty must be filed within five years from accrual. Mo. Rev. Stat. § 516.120(1). An action for unjust enrichment or quantum meruit must also be brought within five years, under § 516.120(1). Estate of Cates v. Brown, 973 S.W.2d 909, 913 & n.3 (Mo. Ct. App. 1998). Missouri law further provides as follows:

> A cause of action for purposes of these limitations periods "shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained.

Mo. Rev. Stat. § 516.100. The phrase "capable of ascertainment" in § 516.100 refers to the fact of damage and does not mandate knowledge of the precise amount. Polytech, Inc. v. Sedgwick James of Mo., Inc., 937 S.W.2d 309, 311 (Mo. Ct. App. 1996).

"In an action on a contract, a cause of action accrues upon a defendant's failure to perform at the time and in the manner contracted, and a statute of limitations begins to run when a suit may be maintained." Hemar Ins. Corp. of Am. v. Ryerson, 108 S.W.3d 90, 94-95 (Mo. Ct. App. 2003). An action for relief on the ground of fraud must be brought within five years, with the cause of action in such a case "deemed not to have accrued until the discovery by the aggrieved party, at any time within ten years of the facts constituting the fraud." Mo. Rev. Stat. § 516.120(5). The statute of limitations is

an affirmative defense,[2] and the party who moves for summary judgment on that basis

bears the burden of showing that it bars the plaintiff's claims.  White v. Zubres, 222

S.W.3d 272, 274 (Mo. 2007) (en banc).

Here, Defendants argue that because a writing evidencing the agreement between

the parties has not been produced, all of Plaintiffs' claims are governed by the five-year

statute of limitations.  Defendants recognize that the timeliness of Plaintiffs' action is

determined based upon the December 3, 2004 filing of the state court action.  See Mo.

Rev. Stat. § 516.230 (Missouri's savings statute).  Thus, according to Defendants, the

present action would be untimely if the limitations period began to run sometime prior to

December 3, 1999.  Defendants assert that "by the end of October, 1994, virtually all of

[the asbestos cases referred by Plaintiffs] cases were dismissed by defendant," and that

the statute of limitations began to run by November 1994, "because the dismissals were

sufficient evidence to place a reasonably prudent person on notice of a potentially

actionable wrong."  (Doc. #72 at 8.)  Defendants argue, alternatively, that the letter of

February 7, 1997, started the running of the limitations period.  This letter both stated

Defendants' position that they "finally reached a position where we can close out our

accounting to you on the asbestos cases referred by you to our offices," and told

Plaintiffs' that as to certain cases, Defendants intended on paying Plaintiffs only 20

percent and not 1/3 of the fees involved.

---

[2]    The Court notes that Defendants raised both the statute of limitations and
laches as affirmative defenses in their answer to the amended complaint.

Plaintiffs argue that "the earliest date on which [Plaintiffs] were put on any notice of any potential breach of the parties' oral agreement by Defendants" was on February 14, 2003, with receipt of the fax stating that the cases were closed, all monies were collected, and all fees were disbursed. (Doc. #78 at 2.)

As noted above, there is a factual dispute as to whether Defendants executed a written "Associate Counsel Agreement." The Court concludes that this matter must be presented to the jury for resolution. While normally "the running of the statute [of limitations] is a question of law for the court to decide . . . when contradictory or different conclusions may be drawn from the evidence as to whether the statute of limitations has run, it is a question [of] fact for the jury to decide." Townsend v. E. Chem. Waste Sys., 234 S.W.3d 452, 463 (Mo. Ct. App. 2007) (citation omitted); see also Capital One Bank v. Creed, 220 S.W.3d 874, 878 (Mo. Ct. App. 2007) (same). If the jury finds that a written "Associate Counsel Agreement" was executed between Plaintiffs and Defendants, then the ten-year limitations would apply to Plaintiff's breach of contract claim, and this claim would not be time-barred. Otherwise, all of Plaintiff's claims would be governed by a five-year limitations period, and as discussed below, would be time-barred. In their January 21, 1999 letter to Plaintiffs, Defendants stated that they had processed through the court system all the asbestos cases referred to them by Plaintiffs, and had accounted to Plaintiffs for them. The only exceptions noted were two companies which had been asbestos judgment-defendants and which were, at the time of the letter, in bankruptcy. Defendants noted the amount of money they expected to recover as fees

from those two companies, based upon the bankruptcy plans. Defendants stated that they would send Plaintiffs their 1/3 share of the fees when Defendants received the monies.

The Court believes that the statute of limitations on all of Plaintiffs' claims accrued, at the latest, with receipt of this letter. At that point, Plaintiffs would have been on notice that Defendants failed to perform at the time and in the manner that Plaintiffs believed was called for pursuant to their agreement with Defendants. Plaintiff's re-initiation of contact with Defendants approximately four years later, on December 24, 2002, did not extend the accrual date; nor did the subsequent correspondence between the parties. Cf. M & D Enters., Inc. v. Wolff, 923 S.W.2d 389, 398-99 (Mo. Ct. App. 1996) (explaining that actions of a plaintiff should not be allowed to delay or unilaterally extend the accrual date of a cause of action).

**Laches**

Defendants argue that if Plaintiffs' claims survived a statute of limitations defense, the doctrine of laches should be applied to bar the present law suit. Under Missouri law, invocation of the equitable doctrine of laches requires that a party with knowledge of facts that give rise to his or her rights unreasonably delays asserting those rights for an excessive period of time, and that the other party suffers legal detriment due to the delay. Hart v. Kupper Parker Commc'ns, Inc., 114 S.W.3d 342, 350 (Mo. Ct. App. 2003). Whether the doctrine of laches applies in a particular case depends on the length of delay, the reasons for the delay, how the delay affected the other party, and the overall fairness in permitting the assertion of the claim. Id. The doctrine is not favored and is

17

used primarily to prevent injustice. <u>Moore v. Weeks</u>, 85 S.W.3d 709, 721 (Mo. Ct. App. 2002). The Missouri Supreme Court has held that "the doctrine of laches will not bar a suit before expiration of the period set forth in the applicable statute of limitations in the absence of special facts demanding extraordinary relief." <u>State ex rel. Gen. Elec. Co. v. Gaertner</u>, 666 S.W.2d 764, 767 (Mo. 1984) (en banc); <u>accord</u> <u>Lane v. Non-Teacher Sch. Employee Ret. Sys. of Mo.</u>, 174 S.W.3d 626, 640 (Mo. Ct. App. 2005). "The burden of proof as to laches rests on the party asserting it." <u>Joplin CMI, Inc. v. Spike's Tool & Die, Inc.</u>, 719 S.W.2d 930, 938 (Mo. Ct. App. 1986).

Here, Defendants argue that the passage of time has resulted in Plaintiffs' inability to locate documents that could help establish what their alleged damages are, and has made it "virtually impossible for Defendant[s] to defend against" Plaintiffs' allegations. (Doc. #72-1 at 14.) Defendants assert that bank records no longer exist that are necessary to prove how much money has been paid or is owed to Plaintiffs. Plaintiffs argue that a review of bank records is not the only way in which Defendants could gather information to assist in their defense; for example, such information might also be found in Defendants' trust account ledger or journal.

The Court concludes that on this record, Defendants have not shown the existence of any "special facts" warranting the application of laches to Plaintiffs' claim of breach of contract, assuming Plaintiffs are to get the benefit of the ten-year statute of limitations for that claim. <u>See</u> <u>Lane</u>, 174 S.W.3d at 640 (holding that the alleged loss or destruction of relevant documents, unavailability of witnesses, and the plaintiffs' loss of

memory did not constitute "special facts" that could invoke the doctrine of laches and bar, before the relevant statute of limitations had run, the plaintiffs' claims against a school district and retirement system for failing to report plaintiffs' creditable service).

## Enforceability of the Fee-sharing Agreement

As a separate ground for summary judgment in their favor, Defendants argue that the agreement between the parties is an unenforceable fee-sharing agreement because it does not comply with Rule 4-1.5(e) of the Missouri Rules of Professional Conduct governing fee-sharing agreements between lawyers of different firms.  In Missouri, an agreement to share attorney fees that does not comply with Rule 4-1.5(e) is unenforceable.  Law Offices of Gary Green, P.C. v. Morrissey,  210 S.W.3d 421, 425 (Mo. Ct. App. 2006); Neilson v. McCloskey, 186 S.W.3d 285, 287 (Mo. Ct. App. 2005). "[I]t makes little difference by what name the association of the two lawyers is called [such as a joint adventure or a special partnership], the agreement to associate must comply with [Rule 4-1.5(e)]."  Risjord v. Lewis, 987 S.W.2d 403, 405 (Mo. Ct. App. 1999) (citation omitted).

The version of the Rule 4-1.5(e) that was in effect when Plaintiffs and Defendants entered into their agreement provided as follows:

> A division of fee between lawyers who are not in the same firm may be made only if:
>
> (1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;

(2) the client is advised of and does not object to the participation of all the lawyers involved; and

(3) the total fee is reasonable.

The Comment to this version of the Rule stated, in pertinent part:

Paragraph (e) permits the lawyers to divide a fee on either the basis of the proportion of services they render or by agreement between the participating lawyers if all assume responsibility for the representation as a whole and the client is advised and does not object. It does not require disclosure to the client of the share that each lawyer is to receive. Joint responsibility for the representation entails the obligations stated in Rule 5.1 for purposes of the matter involved.

This version of Rule 4-1.5(e) mirrored Rule 1.5 of the American Bar Association's ("ABA") Rules of Professional Conduct. Informal Opinion 85-1514 (1985) of the ABA clarifies that where there is a written agreement with the client, such that the second alternative of subsection (1) applies, the assumption of responsibility by an attorney does not require that substantial service be performed by that attorney. In McFarland v. George, 316 S.W.2d 662, 672 (Mo. Ct. App. 1958), the Missouri Court of Appeals stated that in construing the precursor to Rule 5-1.4(e), it "received much help from the [ABA's] opinions" on the ABA's corresponding rule.

The Court believes that the Missouri Supreme Court would conclude that the otherwise valid agreement between Plaintiffs and Defendants is not unenforceable for failure to comply with Rule 4-5.1(e). The total fee of 30% was clearly reasonable. It is undisputed that there were written retainer agreements with each of the asbestos clients in question, pursuant to which both Plaintiffs and Defendants were retained as counsel, and

pursuant to which both Plaintiffs and Defendants were granted a lien upon the proceeds of any settlement or judgment, for fees and costs advanced. Although the retainer agreements did not specify how Plaintiffs and Defendants would share the 30% retainer fee, this is not required. Martin attested that during the pendency of the St. Louis asbestos cases, he was available at all times to assist Defendants with the litigation, and that he maintained professional liability insurance and was jointly responsible for any claims brought against local counsel as a result of legal malpractice.

The Court believes that the Missouri Supreme Court would hold, based upon the above facts, that Plaintiffs "assume[d] joint responsibility for the representation," as that phrase is used in Rule 4-1.5(e). But even if the state's highest court would require more from each attorney, here there is more. It is essentially undisputed that besides doing considerable work in securing the clients and alerting them as to the possible existence of their claims, Plaintiffs also provided Defendants with copies of sample pleadings, interrogatories, requests for production of documents, deposition outlines, and computer equipment to assist with document management of the asbestos litigation. Martin attested that during the pendency of the St. Louis asbestos litigation, he met with one of Defendants' associates in Plaintiffs' offices in California to discuss "in detail the progress of the cases." As noted above, an interrogatory worksheet prepared by Plaintiffs was contained in 70 of the sampling of 73 case files that were inspected by Plaintiffs during discovery. Interrogatory responses referenced Dr. Kilburn -- who was located and secured by Plaintiffs -- as an expert in 71 of these sample files. Dr. Kilburn's medical

report confirming the asbestos-litigation plaintiff's diagnosis was in 66 of these files.

The cases relied upon by Defendants, <u>Londoff v. Vuylsteke</u>, 996 S.W.2d 553 (Mo. Ct. App. 1999), <u>Risjord</u>, 987 S.W.2d at 405, and <u>Neilson,</u> 186 S.W.3d at 287, are inapposite because in those cases, there was no written agreement with the client regarding the fee sharing. Thus the cases were decided under the first alternative of subsection (1) of Rule 4-1.5(e), namely, that the division of fees must be in proportion to the services performed by each lawyer, and statements in those cases suggesting that "actual participation in the handling of the case" is required under either alternative of subsection (1) are dicta. In any event, based upon the facts set forth above, the Court concludes that this requirement was met here.[3]

---

[3] Rule 4-1.5(e) was amended on March 1, 2007, effective July 1, 2007, to provide as follows:

> A division of a fee between lawyers who are not in the same firm may be made only if:
>
> (1) the division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation;
>
> (2) the client agrees to the association and the agreement is confirmed in writing; and
>
> (3) the total fee is reasonable.

The comment to the amended Rule states, in pertinent part:

> A division of fee is a single billing to a client covering the fee of two or more lawyers who are not in the same firm. A division of fee facilitates association of more than one lawyer in a matter in which neither alone could serve the client as well and, most often, is used when the fee is

## Plaintiff's Motion for Partial Summary Judgment

Plaintiffs seek summary judgment on the issue of liability on their claims of breach of oral agreement (Count II ), breach of partnership agreement (Count IV), partnership accounting (Count V), and breach of fiduciary duty (Count VI). In light of the above conclusions with respect to the statute of limitations, summary judgment in favor of Plaintiffs on Counts II and VI these claims must be denied. And summary judgment in favor of Plaintiffs on Counts IV and V cannot be entertained in light of the remaining question of fact underlying the statute of limitations question, namely, whether there was a written agreement between Plaintiffs and Defendants.

The Court will address the motion for summary judgment filed by Holloran Stewart & Schwartz (Doc. #70 incorporating Doc. #14), arguing that it is not a proper party, by separate Memorandum and Order.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgement

---

contingent and the division is between a referring lawyer and a trial specialist. Rule 4-1.5(e) permits the lawyers to divide a fee either on the basis of the proportion of services they render or if each lawyer assumes responsibility for the representation as a whole. In addition, the client must agree to the association and the agreement must be confirmed in writing. It does not require disclosure to the client of the share that each lawyer would receive.

The Court believes that the result reached above would be reached under the amended rule, as well.

on the basis of the statute of limitations and laches is **DENIED in part and GRANTED in part**.  The motion is denied with respect to Count I and granted with respect to the remaining counts in the amended complaint.  [Doc. #71]

      **IT IS FURTHER ORDERED** that Defendants' motion for summary judgement on the basis that the agreement between the parties is an unenforceable fee-sharing agreement is **DENIED**.  [Doc. #70 incorporating Doc. #11]

      **IT IS FURTHER ORDERED** that Plaintiffs' motion for partial summary judgment is **DENIED**. [Doc. #74]

      **IT IS FURTHER ORDERED** that Plaintiffs' motion to strike portions of Defendants' statement of material facts is **DENIED**. [Doc. #89]

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of March, 2008.