UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

EDWIN C. MARTIN, JR.,                    )
a law corporation and as an individual,  )
                                         )
          Plaintiffs,                    )
                                         )
     vs.                                 )  Case No. 4:05CV01857 AGF
                                         )
JAMES P. HOLLORAN, a professional        )
corporation, and JAMES P. HOLLORAN,      )
an individual,                           )
                                         )
          Defendants.                    )

## MEMORANDUM OPINION

A bench trial was held in this diversity case on September 13 through 17, 2010.

The central issue at trial was whether the parties, who are lawyers and their affiliated law

firms, entered into a written fee-sharing agreement in the late 1980s, with respect to

certain asbestos lawsuits. Having reviewed the testimony and evidence adduced, and

having had an opportunity to observe the demeanor and evaluate the credibility of the

witnesses, the Court makes the following findings of fact and conclusions of law, based

upon which judgment shall be entered in favor of Defendants and against Plaintiffs.

## BACKGROUND AND PROCEDURAL HISTORY

This case has had a long and complex history, as reflected in prior Memoranda

and Orders of the Court. For present purposes, the relevant history of the case is as

follows. Plaintiffs Edwin C. Martin, Jr. ("Martin") and his California law firm, Edwin C.

Martin, Jr., a law corporation ("Martin LC"), filed suit in this Court on October 11, 2005, against Defendants James P. Holloran ("Holloran") and his Missouri law firm, James P. Holloran, a professional corporation ("Holloran PC").  Plaintiffs claimed that Defendants owed Plaintiffs money pursuant to a fee-sharing agreement in connection with cases involving workers who were injured as a result of exposure to asbestos.  Plaintiffs had filed a similar action in state court on December 3, 2004, but then voluntarily dismissed the action.

In their eight-count amended complaint, Plaintiffs alleged that in 1987 they entered into a written associate counsel agreement with Defendants, under which Plaintiffs were to conduct medical screenings of certain union workers in St. Louis, Missouri, who had possibly been exposed to asbestos.  Workers who tested positive for an asbestos-related disease would be offered joint representation by Plaintiffs as "national counsel" and Defendants as "local counsel," and Plaintiffs and Defendants would share all fees from such cases, two-thirds to Defendants and one-third to Plaintiffs.  Plaintiffs asserted alternatively that the fee-sharing agreement was oral or constituted an oral partnership agreement.  Plaintiffs alleged that Defendants failed to pay Plaintiffs all monies due under the agreement.

Plaintiffs sought damages under theories of breach of a written agreement (Count I), breach of an oral contract (Count II), breach of a partnership agreement (Count IV), breach of fiduciary duty (Count VI), unjust enrichment and quantum meruit (Count VII),

and misrepresentation (Count VIII).  In Counts III and V, Plaintiffs sought a contractual accounting and a partnership accounting, respectively.   Defendants did not dispute that they had an oral fee-sharing agreement with Plaintiffs, but denied that there had ever been such a written agreement.

On March 27, 2008, the Court entered summary judgment in favor of Defendants, based on Missouri's five-year statute of limitations, on all claims except those based upon the alleged written agreement between the parties.  It is undisputed that the statute stopped running with the filing of the state court action on December 3, 2004. The Court ruled that the statute of limitations began to run on all of Plaintiffs' claims, at the latest, when Plaintiffs received a letter from Defendants dated January 21, 1999.  In that letter, Defendants stated that they had processed through the court system all the asbestos cases subject to the fee-sharing agreement, and had accounted to Plaintiffs for them.  The only exceptions noted were two companies that had been asbestos judgment-defendants and that were, at the time of the letter, in bankruptcy.  Defendants noted the amount of money they expected to recover as fees from those two companies, based upon the bankruptcy plans.  Defendants stated that they would send Plaintiffs their share of those fees when Defendants received the monies.  The Court held that at that point, again, at the latest, Plaintiffs would have been on notice that Defendants failed to perform in the manner that Plaintiffs believed was called for pursuant to the fee-sharing agreement with Defendants.

The Court ruled, however, that a factual dispute as to whether a written fee-sharing agreement had been entered into precluded summary judgment on the claim for breach of such an agreement, a claim which was governed by a ten-year statute of limitations under Missouri law. Because Plaintiffs claimed to have lost the alleged written agreement, the parties agreed, and the Court held, that its existence would have to be proven to the fact-finder by clear and convincing evidence.

In its Memorandum and Order of March 27, 2008, the Court rejected Defendants' further contention that the fee-sharing agreement between the parties was void under Missouri Supreme Court Rule 4.1-5(e) (Missouri Rule of Professional Conduct 1-5(e)). Rather, the Court held that the fee-sharing agreement, whether written or oral, would not be void with respect to any clients with whom the parties had a written retainer agreement in which Plaintiffs and Defendants assumed joint responsibility. In addition, the Court rejected Defendants' affirmative defense of laches.

On August 4, 2010, the Court denied new motions for summary judgment filed by Defendants on multiple grounds directed to the claim of breach of a written agreement. Among their arguments, Defendants asserted that the claim was barred by limitations based on Martin's testimony in his second deposition, taken on September 29, 2009. Defendants contended that this testimony established that the accrual date of the statute of limitations was prior to December 3, 1994, i.e., more than ten years before the state court action was filed. In support of their limitations argument, Defendants asserted that the

accrual date was sometime in December 1991, when, as Martin acknowledged in the second deposition, the parties had a disagreement about the fee allocation in light of Defendants' engaging another law firm, Ness Motley, to assist Defendants with the asbestos cases. Defendants argued that this disagreement would have put Plaintiffs on notice of a potentially actionable breach-of-contract injury, triggering the statute of limitations. The Court held that, based on the summary judgment record, it could not conclude as a matter of law that the statute of limitations began to run prior to December 3, 1994.

The Court also denied Defendants' motion for summary judgment with respect to approximately 140 asbestos clients for whom Plaintiffs could not produce a written retainer agreement pursuant to which Plaintiffs and Defendants assumed joint responsibility. The Court held that a fact question remained on the issue of whether these clients had signed retainer agreements that were subsequently lost.

Several days before trial, the parties waived the right to a jury and the Court granted their request for a bench trial on the issues remaining in the case. At trial, testimony and evidence was presented on whether there had been a written fee-sharing agreement between the parties, the conduct of the parties pursuant to their fee-sharing agreement, and the amount of fees generated by the relevant asbestos cases.

## **FINDINGS OF FACT**

In the mid-1980s, Martin came up with an idea for reducing the cost and time for

workers to determine whether they had contracted an asbestos-related disease. Martin, in collaboration with Rayfield Warshaw, who was a cardio-pulmonary technician, and Kaye Kilburn, M.D., designed and constructed a mobile unit that could be used to screen workers for such a disease in the cities where the workers resided. Warshaw and Dr. Kilburn, in turn, organized a company called Workers' Disease and Detection Services, Inc. ("WDDS"), to conduct screenings across the country for Martin and possibly other unrelated clients.

Martin had connections with several national labor unions, and in the late 1980s and early 1990s, he used those relationships to schedule screenings, using the mobile unit, of the workers in designated unions in approximately ten locations across the county. In each location, Martin contacted a local attorney or law firm to act as "local counsel," in association with Martin's firm as "national counsel," to represent workers who tested positive and who wished to be jointly represented by Martin's law firm and local counsel in seeking damages for asbestos-related diseases. The local counsel selected by Martin in most locations already had experience handling asbestos-related litigation. At some point, Martin prepared a form "Associate Counsel Agreement–Asbestos Litigation Project" ("ACA") to use with local counsel. An exemplar of the form ACA was admitted into evidence by Plaintiffs as Plaintiffs' Ex. 1.

The exemplar states that it is an agreement between local counsel and the law firm of Martin & Harrison ("M & H") to litigate cases in a certain state arising from

6

asbestos-related diseases. The exemplar has blanks to be filled in for the name of the attorney or law firm serving as local counsel and the name of the state. M & H was a partnership that existed at one time prior to the mid-1980s between Martin and another attorney, Jeffrey Harrison. The exact dates when the M & H partnership existed are unclear based on the evidence, but it may still have been in existence as late as 1987. Martin testified that he handled certain legal matters separately from M & H even while M & H was in existence.

The exemplar set forth the responsibilities to be assumed by M & H and local counsel. It called for M & H to conduct the screenings and inform local counsel of individuals who screened positive for an asbestos-related disease "and who shall have executed a retainer agreement" with M & H and local counsel. The retainer agreements were to provide for a one-third contingent fee. Pursuant to the exemplar ACA, the contingent fee was then to be shared, with one-third to M & H and two-thirds to local counsel.

One of the first, if not the first, associations between Martin and a local counsel for the asbestos screening project was with Defendants, for screenings to be conducted in St. Louis. In 1987, Martin phoned Holloran from California and explained the asbestos screening project to him. Martin advised Holloran that he was going to conduct screenings of workers in the local Boilermakers union in St. Louis, and asked Holloran if Defendants would like to associate with him, with Defendants acting as local counsel for

the screened workers who tested positive and signed retainer agreements.

Before contacting him, Martin did not know Holloran, but had heard that Holloran was an experienced plaintiffs' attorney. At the time, Defendants had no experience in asbestos litigation and Holloran told this to Martin; in fact, to Holloran's knowledge, no attorneys in St. Louis had significant, if any, experience in that area of practice at the time. Holloran agreed to the association with Martin, and Martin traveled to St. Louis to meet with Holloran in person to discuss their association.

Holloran and Martin met in St. Louis in April 1987. Martin testified that he came to St. Louis with a form ACA in anticipation that Holloran would sign it. Martin testified that he had an independent recollection of seeing a copy of an ACA, using the form Plaintiffs had prepared, with Holloran's signature on it, prior to the screening of the Boilermakers, which took place on May 24-25 and June 19-20, 1987. Martin testified that he has since retired and moved and could not locate a copy of the actual ACA signed by Holloran. He further testified that at the time of execution of the ACA, the references throughout the exemplar to M & H would have, in all likelihood, been changed to Martin LC. Holloran testified that although he and Plaintiffs did reach an association and one-third/two-thirds fee-sharing agreement, he never saw a written document to that effect, and certainly never signed one.

Based on the record as a whole, and having had the opportunity to observe the demeanor of the witnesses, the Court does not find Martin's testimony credible on the

matter of Holloran signing an ACA similar to the exemplar, or any written fee-sharing agreement. Although Martin testified that it was his practice with all local counsel with whom he associated on the asbestos project to get a written association agreement similar to the exemplar ACA before proceeding with screenings in that area, he was unable to produce any such agreements with most of the other local counsel with whom he had associated. Further, the evidence showed that at least with respect to one of the ten local counsel identified, the relevant screenings took place prior to there being a written ACA with local counsel. Martin was able to produce only one signed ACA with a local counsel that was similar to the exemplar.

Martin's testimony with regard to the existence of a written agreement with Holloran was both vague and conflicting, and contrary to the credible testimony offered by Defendants. No such agreement was found in Defendants' files, nor was any such agreement ever seen by attorneys or support personnel in Defendants' firm who one would expect would have seen such an agreement had it ever existed. Moreover, the parties did not act in accordance with many of the significant terms of the exemplar ACA, and the Court finds unpersuasive Martin's testimony that he simply waived many of the obligations of local counsel set forth therein.

It is true that in a series of letters between the parties in 2002 and 2003, Martin at times referred to a written agreement between the parties, and Holloran never corrected this reference. In fact, in one letter from Holloran to Martin on April 16, 2003, Holloran

himself refers to the parties' "written agreement." Holloran testified that the statement was "loose language" on his part, and that in dictating the letter, he simply picked up the language from Martin's most recent letter, to which he was responding. Under the circumstances then existing, the Court finds this testimony quite plausible. No other correspondence from Holloran references a written ACA.

Defendants do not dispute, and the Court finds, that Plaintiffs and Defendants did enter into an oral agreement in 1987 with regard to the asbestos project for a one-third/two-thirds division of fees with respect to lawsuits filed by Defendants as a result of the Boilermakers screenings.

Plaintiffs further contend that the fee-sharing agreement covered not only lawsuits filed by Defendants, but also workers' compensation and second-injury fund claims that Defendants referred to other counsel. The Court finds, however, that no credible evidence was presented that the parties discussed whether the agreement would apply to fees generated from workers' compensation or second-injury fund claims filed by other counsel upon referral by Holloran.

After the 1987 screenings, additional asbestos screenings took place in St. Louis on June 24-25, 1989, October 7-8, 1989, and March 24-25, 1990, with the local Ironworkers union; and on August 11-12, 1990, with the local Pipefitters and Plumbers union. Martin testified that he and Holloran executed a further written agreement that amended the written ACA to provide that it would apply to these subsequent screenings

as well. Martin testified that this written amendment was also lost. The Court does not find this testimony credible, and credits the conflicting testimony of Holloran that no such written amendment was entered into, although an oral agreement was reached to go forward with these screenings on the same terms as the 1987 screenings. Defendants paid costs and expenses of WDDS associated with all six screenings, totaling $176,539.

Approximately 280 workers tested positive in the six St. Louis screenings. Either at the screenings, or thereafter, Defendants contacted the individuals who tested positive to see if they wanted legal representation to attempt to recover damages for asbestos-caused injuries. Martin had prepared and provided to Defendants a form Asbestos Retainer Agreement to use for this purpose. This Asbestos Retainer Agreement provided that the worker was retaining either The Law Offices of Edwin C. Martin, Jr., or M & H as national counsel and Defendant as local counsel, and would pay a total attorney's fee of one-third of the gross amount of any recovery. Plaintiffs produced 139 signed Asbestos Retainer Agreements at trial. (Pl. Ex. #66).[1] Some of these agreements referenced M & H as national counsel on the heading of the form, and some referenced The Law Offices of Edwin C. Martin, Jr., as national counsel on the heading; in the body of the form, all referenced M & H as national counsel.

---

[1] The parties refer to there being copies of 139 signed Asbestos Retainer Agreements in the record. Plaintiffs' Exhibit 66 only includes 138 such copies. This discrepancy is not material, and the Court adopts the parties' representation as to the existence of 139 such documents.

Beginning in 1988 and continuing for several years thereafter, lawsuits were filed by Defendants on behalf of approximately 257[2] of the St. Louis workers who tested positive in the screenings. Plaintiffs had no involvement in any of the lawsuits themselves; the litigation was handled exclusively by Holloran PC. Plaintiffs' involvement ended after the screenings were arranged. At the screenings, however, X-rays were taken and were reviewed by Warshaw and Dr. Kilburn. Dr. Kilburn prepared reports that were provided to opposing counsel in connection with many of the asbestos lawsuits and he was designated as an expert witness in some of the suits. Plaintiffs did not present any evidence with respect to the quantum meruit value of their services in connection with the asbestos lawsuits, and instead relied at trial on the fee-sharing agreement and retainer agreements as their basis for recovery of damages.

As the asbestos lawsuits progressed, Holloran became concerned about his firm's ability to build the type of case for the asbestos clients that might support an award of punitive damages. Toxic tort litigation of this nature was new to the St. Louis courts and the asbestos defendants had been able to impede Defendants' efforts to obtain discovery. In particular, Defendants had difficulty obtaining the type of historical documents necessary to prove knowing wrongful conduct by the asbestos defendants, which the

---

[2] The number of such clients is not entirely clear. In the post-trial briefs, Plaintiffs represent this number as 257, and Defendants represent it as 266. Plaintiffs' Exhibit #73 suggests that the number was 277. The actual number is not material, and the Court will adopt the number presented by Plaintiffs in their post-trial brief.

Holloran PC attorneys referred to as the "liability documents." From his prior conversations with Martin, Holloran reasonably believed that Plaintiffs, as "national counsel" would be able to assist with the liability documents and documents related to product identification. However, when Holloran went to Martin for assistance in this regard in the late 1980s and very early 1990s, Martin advised Holloran that he had no such information or documents and could not assist him.

Therefore, in the summer of 1991, after exploring other avenues of assistance, Defendants contacted the Ness Motley law firm to assist them with the asbestos cases. Ness Motley had extensive experience and resources in this area of practice, and over the course of many years had obtained the type of documentary evidence related to the asbestos defendants that Holloran thought necessary. Ness Motley agreed to help Defendants in exchange for 40 percent of attorney's fees.

Sometime thereafter, in 1991, Holloran told Martin about the engagement of Ness Motley. Holloran also advised Martin that henceforth, fees recovered in the asbestos cases that were subject to the parties' fee-sharing agreement, and in which Ness Motley participated, would be shared 40 percent to Ness Motley, 40 percent to Defendants, and 20 percent to Plaintiffs, thus reducing Plaintiffs' share of the fees from these cases from 33.33 percent to 20 percent.

Martin testified that he advised Holloran that Holloran was free to associate with Ness Motley, but that he (Martin) disagreed with any reduction in Plaintiffs' share of fees.

Holloran testified that Martin agreed to the modification. In any event, Holloran reasonably believed that the oral fee-sharing agreement between the parties was modified as noted above with respect to the asbestos cases in which Ness Motley was involved, and he thereafter acted consistent with that belief. A letter from Holloran to Martin in February 1997 reflects a 40/40/20 split of the fees referenced therein.

One of the lawsuits subject to the parties' oral fee-sharing agreement in which Ness Motley assisted Defendants was on behalf of a client named Edward Harashe. The Harashe case resulted in a verdict in December 1991 for Mr. Harashe, in the amount of $2.5 million. The verdict was affirmed on appeal, in a published opinion, on February 2, 1993. In lieu of an appeal to the Missouri Supreme Court, the parties to the Harashe lawsuit reached a settlement, slightly discounting the amount of the award for certain accrued interest. In April 1993, after the settlement, Holloran PC paid Plaintiffs 20 percent (approximately $162,000) of the attorney's fees received.

Holloran PC, for all practical purposes, closed all of its files on the asbestos cases by 1994-95. Notwithstanding the correspondence from Holloran in January 1999 stating that essentially all fees had been paid, Plaintiffs did not contact Defendants inquiring whether all amounts had been paid until late 2002 and did not file suit until 2004.

The record is not clear as to the amount of fees Defendants paid Plaintiffs over the years pursuant to the fee-sharing agreement. This uncertainty is due, in large part, to

14

the fact that memories faded and records were lost and could no longer be obtained from third parties because of Plaintiffs' delay in filing this lawsuit. Martin conceded at trial that Plaintiffs had received at least $267,666, although during the pretrial phase of the case, Martin represented that he recollected receiving only approximately $135,000. The Court finds from the credible evidence at trial, that Defendants, in fact, paid Plaintiffs at least $538,000 in such fees.

Plaintiffs' damages expert testified at trial that he performed a case-by-case analysis of 237 files of asbestos cases, including workers compensation claims, that resulted from the six St. Louis screenings, to determine the dollar amount of settlements or verdicts in each case. This was the number of files for such cases, which as noted above totaled approximately 257, that Plaintiffs were able to obtain through discovery. As noted above, signed Asbestos Retainer Agreements were found in 139 of these files. Holloran credibly testified that a written retainer agreement may or may not have been signed by the remaining 98 asbestos clients; if retainer agreements were signed, he could not say that the form Asbestos Retainer Agreement would have been used. Plaintiffs did not offer any testimony or other evidence from any of these 98 clients regarding whether they had signed this or any other form of retainer agreement. As a factual matter, the Court cannot find that signed Asbestos Retainer Agreements, retaining both Plaintiffs and Defendants as counsel, were obtained with respect to these 98 asbestos clients.

Plaintiffs' damages expert further testified that had Defendants paid Plaintiffs

one-third of the fees generated by the 257 cases at issue, Plaintiffs would have received $1,224,258. Because 20 of the 257 files were missing, the expert arrived at this number by averaging the fees involved in the 237 cases he did examine and assigning that average to each of the missing 20 cases. The expert did not separately calculate the one-third share of fees from the 139 cases for which there were written Asbestos Retainer Agreements. Nor did Plaintiffs offer any evidence of what fees would be due Plaintiffs taking into consideration the modification to the fee-sharing arrangement after Ness Motley was retained, or calculate the amount due without regard to the workers' compensation or second-injury fund claims.

## CONCLUSIONS OF LAW

### Existence of a Written Agreement Between the Parties

Under Missouri law, a party relying on a lost or destroyed written agreement bears the burden of proving by clear and convincing evidence both the former existence of the agreement and the terms thereof. Transam. Ins. Co. v. Pa. Nat'l Ins. Co., 908 S.W.2d 173, 175 (Mo. Ct. App. 1995); Brunswick Corp. v. Briscoe, 523 S.W.2d 115, 123 (Mo. Ct. App. 1975). "The clear and convincing standard requires evidence which instantly tilts the scales in the affirmative when weighed against evidence in opposition; evidence which clearly convinces the fact finder of the truth of the proposition to be proved." Coon v. Am. Compressed Steel, Inc., 207 S.W.3d 629, 637 (Mo. Ct. App. 2006) (citation omitted).

Under Federal Rule of Evidence 1004, a preponderance of the evidence standard would apply, unless the proponent lost or destroyed the writing in bad faith. In this case, it makes no difference which standard applies,[3] because the Court concludes that under either standard, Plaintiffs have not met their burden of proving the existence and subsequent loss of a written ACA between the parties. Thus, even assuming, arguendo, that the statute of limitations began to run as late as January 21, 1999, Defendants are entitled to judgment on Plaintiffs' claim for breach of contract, as it is governed by the five-year statute of limitations for oral agreements.

## Statute of Limitations

Even if Plaintiffs had been able to establish the existence of a written fee-sharing agreement, their breach of contract claim would still fail, as it would be barred by the ten-year statute of limitations. Given Martin's testimony that the parties had a disagreement in December 1991 regarding the re-allocation of fees for asbestos cases in which Ness Motley was involved, the Court concludes that this disagreement would have put a reasonably prudent person on notice of a potentially actionable breach-of-contract injury. Thus the statute of limitations on Plaintiffs' contract claims based on the fee-sharing agreement began to run at that point, and are untimely. As stated by the Court in its Memorandum and Order of August 4, 2010, under Missouri law, the statute of limitations

---

[3] Federal courts have arrived at different conclusions on whether the state standard applies in a diversity case. See Kleenit, Inc. v. Sentry Ins. Co., 486 F. Supp. 2d 121, 126 n.2 (D. Mass. 2007) (citing cases).

for a breach of contract claim accrues not when the wrong is done or the technical breach of contract occurs, but when damage is "capable of ascertainment," that is, when "the evidence was such to place a reasonably prudent person on notice of a potentially actionable injury." Pitman v. City of Columbia, 309 S.W.3d 395, 405 (Mo. Ct. App. 2010) (citations omitted). Even if the statue did not begin to run until Martin received the payment related to the Harashe case, for which he was paid 20 percent of the fees rather than 33.33 percent, that occurred in April 1993, also more than ten years before suit was filed.

**Enforceability of Fee-Sharing Agreement**

A substantial portion of Plaintiffs' claim fails for yet another reason. At trial, Plaintiffs did not establish by a preponderance of the evidence, much less by clear and convincing evidence, that any of the 98 clients for whom Plaintiffs were not able to produce copies of a signed Asbestos Retainer Agreement in fact signed a form Asbestos Retainer Agreement, or any other retainer agreement that provided that Plaintiffs and Defendants assumed joint responsibility. Thus, the parties' fee-sharing agreement is void under Missouri Supreme Court Rule 4-1.5(e) as to these 98 clients, as under Missouri law, an agreement to share attorney's fees that does not comply with Rule 4-1.5(e) is unenforceable. Law Offices of Gary Green, P.C. v. Morrissey, 210 S.W.3d 421, 425 (Mo. Ct. App. 2006); Neilson v. McCloskey, 186 S.W.3d 285, 287 (Mo. Ct. App. 2005).

The version of the Rule 4-1.5(e) that was in effect when Plaintiffs and

Defendants entered into their fee-sharing agreement provided that a division of fees between lawyers who are not in the same firm was valid only if, among other things, "the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation." Mo. Sup. Ct. Rule 4-1.5(e)(1) (2006). Here, the second alternative was not met with regard to the 98 cases in question, and the Court concludes, based on the entire record, that Plaintiffs have failed to show that the first alternative was met with respect to any of the asbestos clients. See Morrissey, 210 S.W.3d at 425-26 (affirming dismissal of the plaintiff's petition claiming fees under a fee-sharing agreement, where the petition failed to demonstrate that either alternative of Rule 4-1.5(e)(1) was met); Eng v. Cummings, McClorey, Davis & Acho, PLC, 611 F.3d 428, 435-36 (8th Cir. 2010) (applying the version of Rule 4-1.5(e) that was in effect at the time fee-sharing agreement was entered into, and concluding that the agreement was unenforceable because neither alternative was met).

Further, Plaintiffs presented no evidence of the fees they contend were due them with respect to the 139 clients with such agreements, and for this and other reasons,[4] any

---

[4] For example, the expert did not provide a sufficient foundation for several of the client recovery amounts used or for assigning an "average" recovery with respect to the missing files. Additionally, as noted above, Plaintiffs did not establish the amount owed without regard to the second injury and workers' compensation claims, or the amount still owed after Defendants retained the Ness Motley law firm. Further, Plaintiffs' contention that they received only $267,666 is not credible, and on this record the Court would be unable to allocate which fees paid are attributable to which lawsuits.

award of fees with respect to these clients, on this record, would be unduly speculative.

In addition, as noted above, many of the 139 Asbestos Retainer Agreements showed M & H, and not Plaintiff, as national counsel both on the heading of the agreement and in the text thereof. During the trial, Martin persisted in his contention that the fee-sharing agreement was with Martin LC, and not with M & H. It was only after the entire trial was complete, that Plaintiffs first filed a motion to amend the pleadings, "as may be necessary," to add M & H as a party plaintiff. (Doc. #312). This motion shall be denied as moot, in light of the above findings and conclusions.

But the Court would deny the motion to amend as untimely, in any event. To allow such amendment at this stage of the proceedings would be unduly prejudicial to Defendants, who defended the case based upon the record as it stood through trial. Thus, Defendants did not direct any discovery relevant to M & H, or depose Mr. Harrison, who apparently was still living at the time of Martin's first deposition, but who, Martin claims, is now deceased. Nor are Defendants able to test Plaintiffs' unsupported post-trial assertion that Martin would be the successor-in-interest to the rights of M & H. See Trim Fit, LLC v. Dickey, 607 F.3d 528, 532 (8th Cir. 2010) (holding that the district court did not abuse its discretion in denying the plaintiff's post-trial motion to amend the pleadings, under Federal Rule of Civil Procedure 15(b)(2), to allow the plaintiff to recover damages under a statute not pled, as such an amendment would prejudice the defendant).

## CONCLUSION

Based on all the of the Court's findings and conclusions, Defendants are entitled to judgment in their favor.

Accordingly,

**IT IS HEREBY ORDERED** that judgment is entered in favor of Defendants and against Plaintiffs.

**IT IS FURTHER ORDERED** that all pending motions are **DENIED** as moot.

A separate Judgment shall accompany this Memorandum Opinion.


　　___*Audrey G. Fleissig*_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 20th day of December, 2010.